## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| OMAR ISLAMIC CENTER INC., | ) | 3:19-CV-00488 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF MERIDEN and CITY OF | ) | |
| MERIDEN PLANNING COMMISSION, | ) | September 30, 2022 |
| *Defendants*. | ) | |

### RULING AND ORDER ON DEFENDANTS' MOTION TO DISMISS AND THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

Omar Islamic Center Inc. ("Plaintiff") has brought this action against the City of Meriden ("Meriden") and the City of Meriden Planning Commission (the "Commission" and, collectively with Meriden, "Defendants") pursuant to the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc ("RLUIPA"), 42 U.S.C. § 1983, the Connecticut Religious Freedom Act, Conn. Gen. Stat. § 52-571b ("CRFA"), and Connecticut General Statutes § 8-8(i), claiming that Defendants violated Plaintiff's constitutional rights by prohibiting it from operating a mosque on a property located in Meriden, Connecticut.

Currently before the Court are Defendants' motion to dismiss for lack of subject matter jurisdiction (ECF No. 130), Defendants' motion for summary judgment (ECF No. 131), and Plaintiff's motion for summary judgment (ECF No. 139). In their motion to dismiss, Defendants contend that the Court lacks subject matter jurisdiction to adjudicate Plaintiff's claims. Specifically, Defendants argue that Plaintiff has not suffered an injury in fact and, thus, lacks standing to pursue its claims, and that certain of Plaintiff's claims are moot due to events that occurred after the filing of this suit. Defendants' motion for summary judgment argues that there are no disputed issues of fact and that, based on the undisputed facts, Defendants are entitled to

judgment as a matter of law on all of Plaintiff's claims.  Plaintiff has also moved for summary judgment, arguing that there are no disputed issues of fact and Plaintiff is entitled to judgment as a matter of law on certain of its claims.

For the reasons described below, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss, GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment, and GRANTS IN PART and DENIES IN PART Plaintiff's motion for summary judgment.

## I.       FACTUAL BACKGROUND

The parties generally agree on the following facts relevant to the pending motions.[1] Plaintiff is an organization of Muslims who live in several towns throughout Connecticut, including Meriden.  Defs.' Rule 56(a)2 St., ECF No. 140-1, ¶ 1.  Plaintiff is a 501(c)(3) tax exempt entity.  Pl.'s Rule 56(a)1 St. ¶¶ 1–2, ECF No. 139-86; Defs.' Rule 56(a)1 St., ECF No. 131-2, ¶ 2.  Plaintiff's president and religious leader is Ahmed Bedir.  Defs.' Rule 56(a)2 St. ¶ 1.

At the time of its formation, Plaintiff was located in a small second-floor space, above a pizza restaurant, on Main Street in Middletown, Connecticut (the "Main Street Location"). Defs.' Rule 56(a)2 St. ¶ 4.  This location was approximately 1200 square feet in size and consisted of only two rooms.  Defs.' Rule 56(a)2 St. ¶ 4.  The Main Street Location had no elevator, which made entry difficult or impossible for Plaintiff's disabled and elderly members, and was insufficient to accommodate the size of Plaintiff's congregation, the number of students interested in its Quran and Islamic Studies classes, and the requirements that men and women

---

[1] As the present motion to dismiss is a factual challenge to Plaintiff's standing, the parties are permitted, and required, to rely on evidence outside the pleadings, and the Court will consider such evidence as relevant.  Thus, the factual discussion herein relates to both motions despite its reliance on evidence outside the four corners of the complaint.  *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (describing procedure for assessing a fact-based Rule 12(b)(1) motion that proffers evidence beyond the pleadings).  Where a fact is admitted, the Court cites only to the admission.

separate for prayer and for ritual washing before prayer.  Pl.'s Rule 56(a)1 St. ¶¶ 4–7; Defs.' Rule 56(a)2 St. ¶¶ 4–7.  Thus, in October of 2018, Plaintiff began looking for a larger location that could accommodate its activities.  Defs.' Rule 56(a)2 St. ¶ 13.

After beginning its search for a larger space, Plaintiff discovered a vacant commercial building located at 999 Research Parkway, Meriden, Connecticut (the "Property").  Pl.'s Rule 56(a)1 St. ¶ 14; Defs.' Rule 56(a)1 St., ECF No. 131-2, ¶ 23.  The Property is owned by Research Parkway Associates, LLC (the "Owner").  Defs.' Rule 56(a)2 St. ¶ 15.  The Owner is an LLC whose managing members are Sieglinde Mesiya and Donna Galluzzo (the "Members"). Defs.' Rule 56(a)2 St. ¶ 16; Defs.' Rule 56(a)1 St. ¶ 9.  Mrs. Galluzzo is married to Frank Galluzzo, and Mrs. Mesiya is married to Dr. M. Farooque Mesiya.  Defs.' Rule 56(a)2 St. ¶¶ 17–18.

The Property is located in an M-4 Planned Industrial District of Meriden.  Defs.' Rule 56(a)2 St. ¶ 24; Defs.' Rule 56(a)1 St. ¶ 25.  The primary purpose of the M-4 district is to "encourage well-planned integrated developments of industrial and office use with supportive commercial uses."  *Id.* ¶ 34.  Section 213-32B(1) of the City of Meriden Zoning Regulations (the "Regulations") sets forth the acceptable uses for property in an M-4 district.  Defs.' Rule 56(a)2 St. ¶ 25.

At all times relevant to this matter, Section 213-32B(1) permitted by right in the M-4 district the following uses: offices, hotels, convention centers, shops and stores and service establishments (such as bakeries, barberies, restaurants, and theaters), and institutional, public, and municipal buildings.  Regulations § 213-32B(1); Defs.' Rule 56(a)2 St. ¶ 27.  Until April 15, 2021,[2] Section 213-32B(1) prohibited places of worship in the M-4 district unless they received a

---

[2] The relevant Regulations were amended effective April 15, 2021, pursuant to a consent order entered in *United States of America v. City of Meriden, et al.*, D. Conn. Civ. No. 3:20-cv-1669 (VLB), ECF No. 13 (filed November 9,

special permit.  Defs.' Rule 56(a)2 St. ¶ 28; Defs.' Rule 56(a)1 St. ¶ 26.  Applications for a special permit were submitted to and heard and decided by the Commission.  Defs.' Rule 56(a)1 St. ¶ 39.  The special permit criteria for the M-4 district required a finding that the proposed special permit use "will not tend to depreciate the value of the property in the neighborhood or be otherwise detrimental or aggravating to the neighborhood or its residents or alter the neighborhood's essential characteristics."  Defs.' Rule 56(a)2 St. ¶ 35.

In addition, special permit applicants were required to meet the "special exception" criteria set forth in Section 213-73B of the Regulations, which required the Commission to "take into consideration the health, safety and welfare of the public, in general, and the immediate neighborhood."  Defs.' Rule 56(a)2 St. ¶ 38.   The Commission could "prescribe reasonable conditions and safeguards" to advance the Regulations' objectives.  *Id.*  The Commission was to consider whether "the proposed use is of such location, size and character that, in general, it will be in harmony with the appropriate and orderly development of the district in which it is proposed to be situated, will not tend to depreciate the value of property in the neighborhood, and will not be detrimental to the orderly development of adjacent properties in accordance with the zoning classification of such properties."  *Id.*  After review by the Commission, the City Council also had to approve issuance of the special permit for a use—for example, use as a place of worship—that would have been permitted in the Central Commercial C-1 District but was not permitted as of right under § 213-32B(1).  Defs.' Rule 56(a)2 St. ¶¶ 57–58; Regulations § 213-32B(2)(a).

---

2020).  In that consent order, Meriden agreed to amend the Meriden Zoning Ordinance so that it treats religious assemblies and institutions on equal terms with conference and convention facilities, public and municipal uses and buildings, and theaters in the M-4 district.  *Id.* at 6.  Plaintiff's claims, however, arise from the earlier, pre-2021 Regulations.

In accordance with the Regulations, Plaintiff applied for a special permit on January 28, 2019, seeking permission to use the Property as a place of worship. Defs.' Rule 56(a)2 St. ¶ 41; Defs.' Rule 56(a)1 St. ¶ 23. Plaintiff's application sought to use the Property's first floor as a mosque for twenty-five to thirty families, with a potential increase of up to sixty families. Defs.' Rule 56(a)2 St. ¶ 42. The City Engineer "had no concerns engineering-wise" with respect to Plaintiff's application, and was not otherwise concerned with the safety or traffic effects it would have on the neighborhood. *Id.* ¶ 44. The City Planning Director circulated a memorandum to members of the Commission and city officials stating her office's position that the proposed use would not "negatively impact the area streets, intersections, or neighborhoods" and that, "since there are secular uses allowed as of right" in the M-4 district, "approving [Plaintiff's] application would be consistent with the 'equal terms' provision of RLUIPA." *Id.* ¶¶ 46–48, 51–52.

A public hearing was held on the application on February 13, 2019. *Id.* ¶ 55. On March 13, 2019, the Commission's members unanimously denied Plaintiff's request for a special permit and, on March 20, 2019, the Commission sent Plaintiff a letter confirming the denial. Defs.' Rule 56(a)2 St. ¶¶ 61, 64; Defs.' Rule 56(a)1 St. ¶ 29. Plaintiff brings the present suit claiming the denial of its permit application was due to discrimination in the process and not any legitimate, non-discriminatory reasons.

While all facts set forth thus far are essentially undisputed, there is one central fact the parties disagree on: whether Plaintiff ever had the right to use the Property regardless of the Commission's decision. Plaintiff contends that the Owner was looking to donate the Property to a non-profit organization. Pl.'s Rule 56(a)1 St. ¶ 14. In order to accomplish this goal, the Members and their spouses were working together to find an appropriate recipient for the Property. *Id.* ¶ 20. On December 6, 2018, Mr. Bedir contacted Dr. Mesiya, informed him that

Plaintiff wanted to establish a large community center to serve the Islamic community, and inquired whether he would be willing to donate the Property to Plaintiff. *Id.* ¶ 21. After this email, Dr. Mesiya spoke to Mr. Bedir, met with representatives of Plaintiff, and took them on a tour of the Property. *Id.* ¶ 22. Shortly thereafter, according to Plaintiff, Dr. Mesiya and Mr. Galluzzo, on behalf of Owner, agreed to donate the Property to Plaintiff in December of 2018, subject to Plaintiff's obtaining the City's approval to use the space as a mosque. *Id.* ¶ 23. As discussed above, in furtherance of this goal, Plaintiff submitted its land use application seeking a special permit to allow Plaintiff to use the Property as a place of worship. Pl.'s Rule 56(a)1 St. ¶ 41; Defs.' Rule 56(a)2 St. ¶ 41. The application required the Property owner's signature to "authorize" the application, and the Owner's attorney signed in this capacity. ECF No. 139-19 at 6. Plaintiff contends these facts evince the Owner's agreement to transfer the Property, subject to the City's zoning approval.

Defendants assert, on the other hand, that the Owner did not "enter into an option to transfer the property to Plaintiff" or "enter into a written or oral agreement to donate or otherwise convey the Property" to Plaintiff. Defs.' Rule 56(a)1 St. ¶¶ 43–44. Specifically, Defendants argue that the Owner could only act in two ways, neither of which occurred. First, Defendants argue that the Owner could not have entered into an agreement to transfer the Property because its voting members did not unanimously vote to do so. Defendants claim that, for any action of the Owner to be authorized, it must be approved by a majority of the voting membership of the LLC. *Id.* ¶ 15. As the Owner had only two voting members—Mrs. Galluzzo and Mrs. Mesiya— any action would need to gain unanimous support from those members in order to be approved. *Id.* ¶ 16. Defendants contend that no formal vote on transferring the Property was ever taken. Second, Defendants assert that, at a minimum, Mrs. Galluzzo, as operating member of the

Owner, would have had to agree to transfer the property before a valid agreement could be formed, because the operating member has "full power and authority to act on behalf of the LLC." *Id.* ¶¶ 18–19. Defendants believe that Mrs. Galluzzo did not authorize a transfer, highlighting that neither Mrs. Galluzzo nor Mrs. Mesiya spoke to Mr. Bedir or anyone else affiliated with Plaintiff about the transfer, and that Mrs. Galluzzo does not recall if she ever spoke to Mrs. Mesiya regarding a potential transfer. *Id.* ¶¶ 32–34. According to Defendants, the only evidence that the Property was ever promised to Plaintiff was an email sent on June 12, 2019, after the permit application was already rejected, purporting to express a commitment to donate the Property subject to the required zoning approval. *Id.* ¶ 35. The email was sent by Dr. Mesiya on behalf of Mrs. Mesiya and various trusts that were non-voting members of the Owner. Mrs. Galluzzo was not included on this email, and the first time she saw it was during her deposition in October of 2021. *Id.* ¶ 36. Without Mrs. Galluzzo's approval, according to Defendant, it was impossible for Owner to enter into any agreement regarding the Property, and thus Plaintiff could not have had an enforceable agreement to use the Property, regardless of the Commission's decision. From this version of events, Defendants contend, flow several consequences, including that Plaintiff fails to allege an injury in fact sufficient to provide it standing under Article III, and, if that argument fails, that Plaintiff ultimately cannot succeed on any of the causes of action alleged in its complaint, entitling Defendants to judgment as a matter of law.

## II.    DEFENDANTS' MOTION TO DISMISS

Defendants' motion to dismiss alleges that this Court does not have subject matter jurisdiction over the pending claims for two reasons: first, Plaintiff lacks standing to assert certain claims; and, second, Plaintiff's remaining claims have been mooted by certain events that

postdate the filing of the instant action. If Defendants' contention is correct, this Court must go no further, and the case must be dismissed. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."). Thus, the Court first analyzes Defendants' motion to dismiss.

### A. Legal Standard

Federal Rule of Civil Procedure 12(b)(1) allows defendants to bring a motion to dismiss a case for lack of subject matter jurisdiction. A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Motions to dismiss for both lack of standing and mootness are properly brought under Rule 12(b)(1) because, in both instances, the defendant is challenging the subject matter jurisdiction of the court. *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020) ("A motion to dismiss for lack of Article III standing challenges the subject-matter jurisdiction of a federal court and, accordingly, is properly brought under Fed. R. Civ. P. 12(b)(1)."); *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) ("[w]hen a case becomes moot, the federal courts lack subject matter jurisdiction over the action") (quoting *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir.1994)).

The doctrine of standing is "rooted in the traditional understanding of a case or controversy" and serves to "ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). In order for a litigant to have standing to bring a case, that litigant must have "(1) suffered an injury in fact, (2)

that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

There are two types of motions to dismiss for lack of standing: facial and factual. *Carter*, 822 F.3d at 56. When a defendant mounts a facial challenge, the plaintiff has no evidentiary burden, and the Court is tasked with determining whether the plaintiff's pleading "allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Id.* (alterations in original) (internal citations omitted). On the other hand, a factual motion to dismiss for lack of standing requires a defendant to proffer evidence beyond the pleading and affords a plaintiff an opportunity to respond with evidence of its own. *Id.* In the present case, discovery has been completed and Defendants have presented evidence they believe establishes that Plaintiff lacks standing. Plaintiff has in turn responded with its own evidence that it believes demonstrates its standing. Thus, were it necessary, the Court would "make findings of fact in aid of its decision as to standing." *Id.* Here, the Court concludes that, even resolving all factual disputes in Defendants' favor, Plaintiff has established by a preponderance of the evidence that it has Article III standing to maintain the action. *Makarova*, 201 F.3d at 113. Thus, it is not necessary to, and the Court will not, make factual findings.

In addition to the requirement that a plaintiff have standing, Article III requires that the issue presented to the court also be "live"—in other words, not moot. *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Ed.*, 397 F.3d 77, 84 (2d Cir. 2005). "Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser v. Newkirk*, 422 U.S.

395, 401 (1975). Thus, "if an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013). "A case becomes moot, however, 'only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016). Therefore, "as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).

B. <u>Claims Pursued by Plaintiff</u>

In the instant action, Plaintiff is pursuing several statutory and constitutional claims. Prior to discussing any of the parties' arguments, it is essential to understand the legal foundations of the claims themselves.

*1. RLUIPA Claims*

RLUIPA provides, in pertinent part:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>
> (A) is in furtherance of a compelling governmental interest; and
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). RLUIPA applies only to certain situations, including where the regulation "is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." *Id.* § 2000cc(a)(2). Here, the parties do not dispute that the system in place during the relevant time allowed the Commission to make an individualized assessment,

such that RLUIPA applies to the present action.  RLUIPA defines a "land use regulation" as a "zoning or landmarking law, or the application of such law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest."  42 U.S.C. § 2000cc-5(5).  As described further below, this provision is central to the parties' dispute in this case.

There are four separate claims a plaintiff can assert pursuant to RLUIPA.  In addition to claiming that a government has substantially burdened a plaintiff's religious exercise (a "Substantial Burdens" claim), RLUIPA prevents the application of a law in a manner that: (1) places the religious organization on "less than equal terms" with a nonreligious organization (an "Equal Terms" claim), 42 U.S.C. § 2000cc(b)(1); (2) discriminates against a religious organization on the basis of religion or religious denomination (a "Nondiscrimination" claim), *id.* § 2000cc(b)(2); or (3) "totally excludes religious assemblies from a jurisdiction or unreasonably limits religious assemblies, institutions, or structures within a jurisdiction" (an "Exclusions and Limits" claim), *id.* § 2000cc(b)(3).  Here, Plaintiff alleges Defendants violated all four provisions.

### *2. Constitutional Claims*

Title 42, United States Code, Section 1983 allows a private citizen to bring a cause of action against the government for any violation of the individual's "rights, privileges, or immunities secured by the Constitution."  Here, Plaintiff alleges that Defendants violated its constitutional rights by depriving it of equal protection under the laws and prohibiting its free exercise of religion, and by placing a prior restraint on its religious exercise.[3]

---

[3] As Plaintiff does not seek summary judgment on its prior restraint claim, and Defendants do not specifically attack the claim on the merits, the Court will not discuss the specific elements of this claim further.

Plaintiff can succeed on its equal protection claim by showing: (1) a facially discriminatory law; (2) a facially neutral statute that was adopted with a discriminatory intent and applied with a discriminatory effect; or (3) a facially neutral law that is enforced in a discriminatory manner. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, N.Y.*, 945 F.3d 83, 110–11 (2d Cir. 2019) (quoting *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Hist. Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014)).

The Free Exercise Clause of the Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Thus, where a law is restrictive of religious practice, it "must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Id.* at 546. To prove this claim, Plaintiff must demonstrate that the Regulations restricted its religious exercise without advancing important interests or being narrowly tailored to those interests.

### 3.   State Law Claims

Finally, Plaintiff brings two state law claims:  a claim under Connecticut General Statutes § 8-8 to appeal the zoning decision of the Commission, and a claim under the CRFA. To succeed on its zoning appeal under Connecticut General Statutes § 8-8, Plaintiff must simply show that it is an aggrieved person as defined in the statute and that the decision by the Commission was incorrect.

The CRFA provides that "the state or any political subdivision of the state shall not burden a person's exercise of religion . . . even if the burden results from a rule of general applicability," unless the burden is applied "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that compelling governmental interest."

Conn. Gen. Stat. § 52-571b.  As with its federal free exercise claim, if Plaintiff shows that the Regulations burdened its religious exercise without being narrowly tailored in furtherance of a compelling government interest, Plaintiff can succeed on its CRFA claim.

With that background in mind, the Court begins its examination of Defendants' motion to dismiss.

### C.  Discussion

#### 1.  Standing to Bring RLUIPA Claims

##### a.  Article III Standing and "Statutory Standing"

In their motion to dismiss, Defendants argue that Plaintiff has failed to show an injury in fact, and thus lacks standing to assert its RLUIPA claims.[4]  To establish an injury in fact, a plaintiff must show that he or she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  The injury in fact requirement is a "low threshold" that "helps to ensure that the plaintiff has a personal stake in the outcome of the controversy."  *John v. Whole Foods Market Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (internal quotation marks omitted).

Defendants' argument regarding Plaintiff's standing to bring RLUIPA claims centers on Defendants' view that Plaintiff has no property interest in the Property that is cognizable under RLUIPA.  Defendants draw support for this argument from RLUIPA's definition of "land use regulations," which states that the statute only applies where the claimant "has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or

---

[4] In order to have constitutional standing under Article III to maintain a cause of action, a Plaintiff must show an injury in fact, traceable to the Defendants' conduct, that can be redressed by a judgment of the court.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  As Defendants make no argument regarding the traceability and redressability prongs of the standing analysis, the Court will not address them.

option to acquire such an interest." 42 U.S.C. § 2000cc-5(5). Defendants argue that Plaintiff has no property interest or contract or option to acquire such an interest, and thus cannot maintain a RLUIPA claim.

Defendants suggest that the text of RLUIPA itself requires a district court to dismiss, for lack of subject matter jurisdiction, any RLUIPA case in which the plaintiff does not have the statutorily-defined property interest. Put another way, Defendants request that the Court read the statute's definition of "land use regulation" as a jurisdictional bar on a district court's ability to hear an action. Such a reading is contrary to both the statute and Supreme Court guidance.

The Supreme Court has observed that courts throughout the country have "been less than meticulous" in examining the "subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006). Thus, the Supreme Court has made clear that only where the "legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional" should courts treat it as such. *Id.* at 515. In the present action, there is no language in RLUIPA's definition of "land use regulation" that speaks in "jurisdictional terms or refer[s] in any way to the jurisdiction of the court," *id.* (internal quotations omitted), or otherwise suggests Congress intended the definition to be jurisdictional in nature. Further, RLUIPA specifically states that "standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution." 42 U.S.C.A. § 2000cc-2.

Defendants further confuse traditional Article III standing principles with so-called statutory standing, which is the determination of whether a plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–28 (2014) (distinguishing between Article III standing and

a determination of whether a plaintiff has a right to sue under a particular statute).  Whether a plaintiff may sue under a statute is a question going to the merits of the dispute, not one of standing.  The Second Circuit has made clear that standing is a completely separate question "from whether [a plaintiff] has a cause of action."  *SM Kids, LLC*, 963 F.3d at 212 (rejecting the defendant's argument, in a claim for trademark infringement, that the plaintiff did not have a valid trademark and therefore suffered no injury in fact, and noting that the lack of a trademark was instead a defense that could be raised to show that the plaintiff could not establish its case in chief); *see also Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff has a cause of action under the statute").  Courts must not accept "arguments that would essentially collapse the standing inquiry into the merits."  *SM Kids, LLC*, 963 F.3d at 212.

Under Second Circuit law, a plaintiff need not have a legally cognizable property interest in order to have Article III standing to bring a claim pursuant to RLUIPA.  *Chabad Lubavitch*, 768 F.3d at 200.  In *Chabad Lubavitch*, a religious corporation founded by a Jewish rabbi purchased a historic property in Litchfield, Connecticut, with the intention of expanding the building to accommodate the Chabad's religious mission and a large residence for the rabbi.  *Id.* at 187.  The Litchfield historic district commission denied the corporation's request for a building permit.  *Id.* at 190.  In considering whether the rabbi had standing as a plaintiff in the resulting RLUIPA action, the Second Circuit distinguished between Article III standing and "statutory standing."  *Id.* at 201.  First, the court reiterated that Article III standing requires only that a litigant establish he or she has suffered a "concrete and particularized injury in fact that is

fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Id.*

The Second Circuit then made clear that "whether a statute permits a plaintiff to pursue a claim" is a different inquiry entirely. *Id.* Specifically, whether a claim satisfies the statute such that a plaintiff can maintain a claim "goes not to the court's jurisdiction—that is, power—to adjudicate a case, but instead to whether the plaintiff has adequately pled a claim." *Id.* The court held that the rabbi had Article III standing even though he did not have a legal interest in the property at issue, because he would have been able to live on the premises but for the denial of the plaintiff's zoning application. *Id.* ("The [historic district commission's] denial of the Chabad's application, and the conditions it imposed on any renewed application, thus deprived Rabbi Eisenbach of the ability to live in the facilities as proposed, an injury that may be redressed by relief from the district court.").

Defendants argue that *Chabad Lubavitch* is distinguishable from the present action because the rabbi's "right to live on the premises was dependent on and derived from the plaintiff religious organization's ownership of the premises." ECF No. 130-1 at 21. But the Second Circuit did not frame the rabbi's standing as dependent upon the Chabad's ownership of the property. Rather, it examined his Article III standing independently and held that he had suffered a cognizable injury in fact when the commission, by denying the building permit, frustrated his effort to reside at the new property. That holding is consistent with the long-established principle that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Thus, contrary to Defendant's position, *Chabad Lubavitch* is

not distinguishable from the present case, and it is clear that Plaintiff here need not have a property interest as defined in RLUIPA to have Article III standing to bring a claim.

### b. Plaintiff's Injury in Fact

The Court now turns to whether Plaintiff has alleged an injury in fact under traditional Article III justiciability principles.   Plaintiff points to several injuries it believes satisfy the requirements, including that it was required to spend money as a result of the denial of its permit and that it was discriminated against in the process of seeking the permit.   The Court agrees with Plaintiff, and finds that Plaintiff has Article III standing to pursue its RLUIPA claims.

First, Plaintiff alleges that it was forced to spend time and money both applying for the permit that was denied, as well as looking for an alternative site after the denial of its permit. ECF No. 143 at 18–19.  As "any monetary loss suffered by the plaintiff" satisfies the injury in fact requirement of Article III standing, *Carter*, 822 F.3d at 55, Plaintiff clearly has injuries sufficient to confer constitutional standing to bring its RLUIPA claims.

Second, Plaintiff has alleged discrimination, which is a sufficient injury in fact to pursue RLUIPA claims.  In *Tartikov*, 945 F.3d at 110, the Second Circuit held that a plaintiff adequately alleged Article III standing under RLUIPA for its Nondiscrimination and Equal Terms claims because stigmatizing the plaintiffs "as innately inferior and therefore as less worthy participants in the political community—i.e. discrimination—is an actual and concrete injury to confer standing." *Id.  See also Orthodox Jewish Coal. of Chestnut Ridge v. Vill. of Chestnut Ridge, N.Y.*, No. 19-CV-443 (KMK), 2021 WL 1226930, at *14 (S.D.N.Y. Mar. 31, 2021) ("discrimination . . . is an actual and concrete injury sufficient to confer standing" (alteration in original) (quoting *Tartikov*, 945 F.3d at 110)).   Moreover, *Tartikov*'s holding that the plaintiff there did not have standing to assert Substantial Burden or Exclusion and Limits claims under

RLUIPA was based on the fact that that the plaintiff had not submitted "a formal proposal for the building project, applied for a permit, or engaged in any other conduct that would implicate or invoke the operation of the challenged zoning laws," thus making its injury for those claims purely conjectural. 945 F.3d at 110. Here, by contrast, Plaintiff applied for, and was denied, a permit for reasons it alleges were discriminatory. Compl. ¶ 89. This suffices to show actual injury for purposes of bringing claims under the RLUIPA's Substantial Burdens and Exclusions and Limits provisions. Therefore, Plaintiff has demonstrated injury in fact sufficient to pursue each of its RLUIPA claims.

### 2. *Plaintiff's Standing to Assert State Law Claims*

Defendants also argue that Plaintiff lacks standing to assert its state law claims. Specifically, as related to the CRFA, Defendants assert that the act is coterminous with RLUIPA; therefore, Defendants contend, for the same reasons Plaintiff lacks standing to bring its RLUIPA claims, it also lacks standing to bring claims under the CRFA. Defendants further argue that Plaintiff is not "aggrieved" within the meaning of Connecticut General Statutes § 8-8 and thus does not have standing to pursue its zoning appeal under that statute.

Defendants' arguments on state law miss the mark. "Standing in federal court is a question of federal law, not state law." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013). Thus, "federal law sets the parameters on what is necessary to possess Article III standing" and "state law can neither enlarge nor diminish those requirements." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 385 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 757, 211 L. Ed. 2d 475 (2022). As the Court has already determined that Plaintiff possesses Article III standing to bring its claims, Defendants' argument that Plaintiff lacks standing to pursue its state law claims fails at the threshold. In any event, Defendants' state law standing arguments simply reiterate

their incorrect statutory standing arguments in the context of the state laws at issue. For the reasons described above, this line of argument fails. Plaintiff has alleged injuries in fact sufficient to allow their state law claims to proceed.

### 3. Mootness

The final argument raised by Defendants in their motion to dismiss is that, due to intervening events that have taken place since the instant suit was filed—specifically, Owner deciding not to donate the Property to Plaintiff and Meriden amending the zoning ordinances at issue in this case—Plaintiff's facial challenge to the Regulations and its request for injunctive relief are moot. It is unclear from the briefing whether Defendants believe all claims brought pursuant to § 1983 are moot, or only those claims requesting injunctive relief. To the extent Defendants argue that Plaintiff's requests for injunctive relief are moot, Plaintiff agrees. *See* ECF No. 143 at 37. Accordingly, Plaintiff's § 1983 claims, to the extent they seek injunctive relief, are dismissed from this case.

Although Defendants do not specifically address Plaintiff's claims for declaratory relief, the Court must, because if a claim becomes moot, the Court lacks subject matter jurisdiction over that claim, and it must be dismissed. *Doyle*, 722 F.3d at 80; Fed. R. Civ. P. 12(h)(3); *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) (noting that, if there are questions about its subject matter jurisdiction, the Court must examine the issue *sua sponte*). Thus, the Court examines whether Plaintiff's requests for declaratory relief are moot.

When this case began, Plaintiff was seeking a declaration that the Regulations were unconstitutional. Compl., ECF No. 1, Prayer for Relief. Such a declaration would have been within the power of the Court to grant, under appropriate circumstances. As discussed above, however, the Regulations have since been amended, and the Regulations as to which Plaintiff

brought its complaint are no longer in effect.  Thus, as discussed at oral argument, Plaintiff now effectively seeks a declaration that its constitutional rights were infringed in the past.  Whether Plaintiff may seek such a declaration is a different question entirely.

The general rule is that "declaratory relief operates prospectively to enable parties to adjudicate claims before either side suffers great damages."  *Orr v. Waterbury Police Dep't*, No. 3:17-CV-788 (VAB), 2018 WL 780218, at *7 (D. Conn. Feb. 8, 2018).  Thus, declarations that a defendant "violated federal law in the past" are prohibited.  *Green v. Mansour*, 474 U.S. 64, 74 (1985).[5]  The Court therefore finds that Plaintiff's requests for declaratory relief have been mooted by the amendments to the Regulations.  *See Marin v. Town of Southeast*, 136 F. Supp. 3d 548, 563 (S.D.N.Y. 2015) (finding as moot requests for declaratory relief based on facial challenges to laws that were superseded; collecting similar cases); *Lewis v. Cuomo*, 575 F. Supp. 3d 386, 396 (W.D.N.Y. 2021) ("[a]n action seeking declaratory and/or injunctive relief against an allegedly unconstitutional statute becomes moot if the statute is repealed").  Accordingly, Plaintiff's § 1983 claims, in so far as they seek declaratory relief, are dismissed from this case.

The Court cannot find as moot, however, Plaintiff's § 1983 claims challenging the Regulations insofar as they seek damages.  Where a plaintiff seeks damages for a past constitutional violation, changing or withdrawing a challenged policy will not moot that plaintiff's claims.  *Dean v. Blumenthal*, 577 F.3d 60, 66 (2d Cir. 2009) (recognizing that withdrawal of a challenged policy does not moot a complaint seeking damages under 42 U.S.C. § 1983); *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1168 (9th Cir. 2011) (claims brought under the RLUIPA for damages were not moot despite revision of

---

[5] The Court recognizes that the holding in *Green* was based at least in part on the fact that the declaratory relief sought against the state actors would have "much the same effect" as a damages award that was prohibited by the Eleventh Amendment's grant of sovereign immunity.  474 U.S. at 73.  While the Eleventh Amendment does not apply to municipalities like Defendants here, the Court is aware of no authority holding that the general prohibition on declarations of prior constitutional violations applies only where a state, rather than a municipality, is involved.

ordinance and organization losing title to property, where plaintiff had pleaded actual monetary damages as a result of the prior ordinance and denial of permit). Defendants seem to concede as much in their reply brief, in which they note that Plaintiff's "claims under the prior zoning ordinance survive mootness only to the extent its application allegedly caused past deprivation and damages." ECF No. 146 at 8. Defendants contest, however, that Plaintiff can show it suffered monetary damages, as it "did not have an interest in the Property." *Id.* This argument ignores Plaintiff's claims for damages that are unrelated to the dispute concerning Plaintiff's interest in the Property. Plaintiff has alleged that, among other things, it incurred approximately $46,000 in costs in finding and renovating an alternate location to conduct its activities due to the denial of its permit. Pl.'s Rule 56(a)1 St. ¶ 80. Further still, even if Plaintiff is ultimately unable to prove that it suffered any damages, as Defendants contend, Plaintiff's claim is not moot because nominal damages, which satisfy the redressability element of standing and prevent a cause of action from becoming moot, are available where a plaintiff has had its constitutional rights violated. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (where plaintiff's claim becomes otherwise unredressable during litigation, availability of nominal damages prevents cases from being dismissed as moot).

For these reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's requests for injunctive and declaratory relief are dismissed as moot. The remainder of Defendants' motion is DENIED.

### III.    MOTIONS FOR SUMMARY JUDGMENT

The Court now turns to examine the parties' cross motions for summary judgment. Plaintiff has moved for summary judgment on some, but not all of its claims. Defendants, on the

other hand, have moved for summary judgment on all of Plaintiff's claims.  The Court addresses each of Plaintiff's causes of action in turn below.

### A.  Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  It is the moving party's burden to show there are no disputed material facts.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This burden can be met by pointing out an absence of evidence to support the non-moving party's case.  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  If the moving party demonstrates there are no disputed issues of material fact, the burden shifts to the non-moving party to rebut this showing through introduction of "specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  When examining the record, "the court must resolve all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide."  *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992).  Thus, "only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

### B.  Discussion

#### 1.  RLUIPA Claims (Counts One, Two, Three, and Four)

As discussed above, Plaintiff brings four claims pursuant to RLUIPA.  It seeks summary judgment on only three, however—its Substantial Burden, Equal Terms, and Discrimination

claims.  Defendant seeks summary judgment on all of Plaintiff's RLUIPA claims, but mounts only a single argument in support of its motion:  that Plaintiff did not possess the requisite property interest in the Property to recover under RLUIPA.  Therefore, the Court first examines whether Plaintiff had such an interest.

### a.  Property Interest

Under RLUIPA, a plaintiff can only recover based on a claim that the government has imposed a "land use regulation" that infringes on the plaintiff's religious freedoms.  42 U.S.C. § 2000cc.  As described above, RLUIPA defines a land use regulation as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest."  42 U.S.C. § 2000cc-5.  Thus, in order for Plaintiff to prevail on its RLUIPA claim, it must show that it has an "ownership, leasehold, easement, servitude, or other property interest" or an "option to acquire such an interest" in the Property at issue in this case. Whether Plaintiff has the requisite interest is the parties' largest disagreement in this dispute.

In short, Defendants assert that Plaintiff was never granted the right to use the Property, as the only way such a right could have been given to Plaintiff was through assent by Mrs. Galluzzo or a vote of both Mrs. Galluzzo and Mrs. Mesiya.  As neither of those events occurred, Defendants contend that Plaintiff never obtained an interest in the property sufficient to allow it to bring the present RLUIPA suit.

Plaintiff, on the other hand, argues that whether or not such permission was granted by Mrs. Galluzzo, Mr. Galluzzo and Dr. Mesiya were acting as agents of the Owner during the relevant time period, such that their offer to give the Property to Plaintiff was legally binding and

indeed conferred a property interest on Plaintiff sufficient to maintain its RLUIPA claims. ECF No. 141 at 17. For the reasons discussed below, there are material issues of fact such that granting summary judgment to either party as to Plaintiff's RLUIPA claims is inappropriate.

Plaintiff's summary judgment motion argues that the actions of Mr. Galluzzo and Dr. Mesiya provided Plaintiff with the requisite property interest to sustain a RLUIPA action, as a matter of law. Plaintiff makes no argument that either Mrs. Galluzzo independently, or Mrs. Galluzzo and Mrs. Mesiya together, entered into an agreement to donate the Property to Plaintiff. Plaintiff instead contends that an agreement existed in this case based on the actions of Mr. Galluzzo and Dr. Mesiya. Since the Property is located in Connecticut, the Court will look to Connecticut law[6] to determine whether Plaintiff has a cognizable property interest. *See Muslim Cmty. Ass'n of Ann Arbor v. Pittsfield Charter Twp.*, No. 12-CV-10803, 2015 WL 1286813, at *7 (E.D. Mich. Mar. 20, 2015) (utilizing Michigan law to determine whether the plaintiff in an action under RLUIPA had a sufficient interest in a property in Michigan).

As Plaintiff bases its entire theory of an enforceable agreement on the argument that Mr. Galluzzo and Dr. Mesiya were agents of the Owner, a short examination of the Connecticut law of agency is required. "It is a general rule of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment." *Maharishi Sch. Vedic Scis., Inc. v. Conn. Const. Assocs. Ltd. P'ship*, 799 A.2d 1027, 1031–32 (Conn. 2002). In order to show that an agency relationship existed, Plaintiff must show "(1) a manifestation by the principal that

---

[6] As an initial matter, the Connecticut Statute of Frauds requires transactions involving real property to be put in writing. Conn. Gen. Stat. § 52-550. For a transaction contingent on the decision of a zoning board or commission, however, an oral agreement to convey property can be sufficient. *Moutinho v. Plan. & Zoning Comm'n of City of Bridgeport*, 899 A.2d 26, 33 (Conn. 2006) (when the evidence establishes the existence of an oral agreement and the intent of the parties to abide by that agreement, "after the fulfillment of a contingency," such as the decision of a zoning board, "a substantial and legitimate interest" in the property exists). Although *Moutinho* arises in the zoning appeal context, Defendant does not contest that, under Connecticut law, a written *or oral* agreement can be sufficient to convey an interest in property. ECF No. 131-1 at 14.

the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *McDermott v. Calvary Baptist Church*, 819 A.2d 795, 799 (Conn. 2003). An agent can have either actual or apparent authority to act on behalf of its principal, either one of which is sufficient to allow action. *Maharishi Sch. Vedic Scis., Inc.*, 799 A.2d at 1032.

### i.  Actual Authority

First, actual authority exists where an agent's action is "expressly authorized by resolution of the board of directors . . . [is] impliedly authorized by the board of directors . . . or . . . although not authorized, [is] subsequently ratified by the board of directors." *Id.* (alterations in original) (quoting *Czarnecki v. Plastics Liquidating Co.*, 425 A.2d 1289, 1293 (Conn. 1979)). Importantly for the present case, "implied authority is actual authority circumstantially proved. It is the authority which the principal intended his agent to possess," although not expressly granted. *Czarnecki*, 425 A.2d at 1293. Here, Plaintiff argues that actual authority was granted to Mr. Galluzzo and Dr. Mesiya both expressly and impliedly.

In support of the argument that express authority existed, Plaintiff points to the deposition testimony of Mrs. Galluzzo and Mrs. Mesiya. Specifically, Plaintiff argues that Mrs. Galluzzo's deposition testimony established that she requested her husband "take care of the real estate" and that she "hoped he was connecting with Farooque and Mesiya regarding 999 Research Parkway." ECF No. 139-85 at 61:19–23. Mrs. Mesiya, in turn, testified that Mr. Galluzzo had "authority to make a commitment to transfer 999 Research Parkway to Omar Islamic" and that Dr. Mesiya had authority to negotiate, and was in fact negotiating, the terms of donating the Property to Plaintiff. ECF No. 141-4 at 42:8–11; 48:13–19. Defendants, on the other hand, argue that while Mrs. Galluzzo at times delegated matters related to the property to others, she never delegated the

ability to make final decisions about what happened.  *See* ECF No. 139-85 at 62:16–21 ("I gave him responsibility in trying to either lease, sell or donate the building as necessary.  But in the end I would expect him to come back to me for final conversation as to what the outcome would be.").

The arguments by the parties regarding whether the husbands, Mr. Galluzzo and Dr. Mesiya, had implied authority are equally at odds.  Plaintiff argues that "past practice" of the LLC, including negotiating a licensing deal with Amazon, makes clear that the husbands handled transactions such as the one at issue here.  ECF No. 141 at 21–22.  Conversely, Defendants argue that the past practice of the parties was to provide Mrs. Galluzzo with a final agreement that she could approve prior to entering any deal.  ECF No. 139-85 at 62:16–21.  Further, Defendants argue that Dr. Mesiya never discussed the deal to donate the Property to Plaintiff with Mrs. Galluzzo such that she was able to impliedly consent to the husbands donating the property.  *Id.* at 27:15-28:12.

The Court need go no further with this recitation of the arguments.  "It is well settled that [t]he nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn." *Maharishi Sch. Vedic Scis., Inc.*, 799 A.2d at 1031.  It is clear to the Court based on the record before it that a reasonable jury could find that the husbands possessed the ability, either impliedly or explicitly, to enter into an agreement on behalf of the Owner.  However, it is equally possible that a reasonable jury could find that they did not.  Thus, it would be inappropriate for the Court to grant summary judgment to either party on this issue.  *Urbont v. Sony Music Ent.*, 831 F.3d 80, 88 (2d Cir. 2016) ("When deciding a summary judgment motion, a . . . court's function is not to weigh the evidence, make credibility determinations or resolve issues of fact,

but rather to determine whether, drawing all reasonable inferences from the evidence presented in favor of the non-moving party, a fair-minded jury could find in the non-moving party's favor.").

### ii.   Apparent Authority

Plaintiff next argues that, even if the husbands did not have actual authority, they had apparent authority to enter a contract for the donation of the land on behalf of the Owner. "Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses." *Gordon v. Tobias*, 817 A.2d 683, 689 (2003).  Thus, apparent authority is judged not by "the agents own acts, but by the acts of the agent's principal." *Id.*  In order to show the husbands had apparent authority, Plaintiff must demonstrate that (1) "the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted the agent to act as having such authority" and (2) "the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal." *Tomlinson v. Bd. of Educ. of City of Bristol*, 629 A.2d 333, 349 (1993) (internal citations and quotations omitted).

In support of the arguments surrounding apparent authority, the parties rely on substantially the same evidence discussed above.  As with the issue of actual authority, "the issue of apparent authority is one of fact." *Gordon*, 817 A.2d at 851.  Just as with actual authority, it would not be unreasonable for a jury to find either that the husbands did, or did not, possess apparent authority.  Thus, granting summary judgment on this issue would be inappropriate.

Defendants' summary judgment motion focuses on the terms of the Owner's operating agreement.  *See* ECF No. 131-1 at 5.  Specifically, Defendants contend that they are entitled to

judgment as a matter of law because Plaintiff does not dispute that no vote was taken by Mrs. Galluzzo and Mrs. Mesiya about whether to donate the Property to Plaintiff, as was required under the operating agreement, and that Mrs. Galluzzo, as the operating member, did not authorize any transaction with Plaintiff. *Id.* at 14–15. As discussed above, Plaintiff counters with evidence that Mr. Galluzzo and Dr. Mesiya had authority to bind the Owner to provide the Property to Plaintiff and did in fact do so, regardless of the terms of the operating agreement. ECF No. 141 at 18–29. Plaintiff also argues that the Owner operated informally, and that no official votes were ever taken on any matter, so the couples' course of dealing—including granting authority to the husbands to negotiate the donation of the Property to Plaintiff—should, in essence, trump the terms of the operating agreement. *Id.* Because there are genuine issues of material fact concerning the existence and scope of the husbands' authority to convey the Property to Plaintiff, and the effect of the couples' course of dealing on that purported authority, Defendants cannot prevail on their summary judgment motion.

Having determined that neither party has carried its burden to demonstrate, as a matter of law, whether Plaintiff had or did not have the requisite interest in the Property, the Court cannot grant summary judgment to either party on any of the RLUIPA claims. Thus, the Court need not, and will not, examine any other elements of the RLUIPA claims further at this time. Both Plaintiff's and Defendants' motions for summary judgment on the RLUIPA claims are DENIED.

2. *Section 1983 Claims (Counts Five, Six, and Seven)*

In addition to its claims under RLUIPA, Plaintiff seeks to enforce its constitutional rights by bringing claims pursuant to 42 U.S.C. § 1983. Plaintiff moves for summary judgment on its claims that Defendants violated its rights to free exercise of religion and equal protection under the law. Defendants cross-move for summary judgment on Plaintiff's free exercise and equal

protection claims, and, further, move for summary judgment on Plaintiff's prior restraint claim. The Court examines each cause of action below.

*a. Free Exercise*

"The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, provides that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531 (citation omitted). Where a law is not neutral and generally applicable, it is reviewed with strict scrutiny, meaning that it "must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Id.* at 546. Where the government seeks to enforce a neutral law of general applicability, however, the government need only show a rational basis for its enforcement, even if such enforcement incidentally burdens a party's religious practices. *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002). Thus, the first question for this Court to decide is whether the instant Regulations are subject to strict scrutiny or the rational basis test.

Although the majority of circuits that have confronted this issue have determined that "zoning laws with the opportunity for individualized variances are neutral laws of general applicability," and are thus subject only to rational basis review, the Second Circuit has expressly declined to determine whether such decisions "challenged under the Free Exercise Clause are subject to strict scrutiny or rational basis review." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 220 (2d Cir. 2012). The Second Circuit was able to avoid deciding the particular standard of review in *Fortress Bible Church* because, in that case, regardless of which standard applied, the ordinance at issue could not survive. *Id.*

The Supreme Court, however, has recently clarified what it means for a statute to be neutral and generally applicable in the free exercise context. Specifically, a statute is not neutral or generally applicable "whenever [it] treats *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original). Moreover, even if "a State [statute] treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue," that does not save the statute from being examined under the strict scrutiny standard. *Id.*

In the present action, the Regulations allowed hotels, motels, and convention centers, as well as numerous shops and stores including bakeries, restaurants, and theaters, to operate as of right in the M-4 district, without needing to apply for a special permit. *See* Regulations § 213-32(B)(1). Places of worship, however, were required to obtain a special permit before opening their doors. It is clear to the Court that, under the test set forth by the Supreme Court in *Tandon*, at least some comparable secular activities were therefore treated more favorably than religious activities under the Regulations. Thus, the law is not neutral and generally applicable under free exercise principles, and it must be examined with strict scrutiny.

Defendants have not defended the law under either a rational basis or strict scrutiny standard. In fact, they have proffered no rationale underlying the law whatsoever. Instead, Defendants again argue, both in opposition to Plaintiff's motion and in support of their own, that because Plaintiff did not have a right to use the Property, it was not substantially burdened and thus cannot prevail on its free exercise claim. This argument conflates the substantial burden test sometimes applied to equal protection challenges with the appropriate analysis of a free exercise claim. *Compare Congregation Rabbinical Coll. of Tartikov, Inc.*, 945 F.3d at 110, *with Fifth Ave. Presbyterian Church*, 293 F.3d at 574. It is thus unclear what relevance, if any,

Defendants' argument has to Plaintiff's free exercise claim.  Defendants cite no law, and the Court is aware of none, that requires Plaintiff to have a property interest to bring a First Amendment free exercise claim.  In fact, case law seems to indicate just the opposite.  *See E. End Eruv Ass'n, Inc. v. Vill. of Westhampton Beach*, 828 F. Supp. 2d 526, 540 (E.D.N.Y. 2011) (conducting free exercise analysis despite finding Plaintiff lacked property interest under RLUIPA).

Defendant's failure to justify the Regulations in any manner is fatal.  Their summary judgment motion on Plaintiff's free exercise claim is denied, and Plaintiff's cross-motion is granted.  The Court does not discount, however, that Defendants' argument related to Plaintiff's alleged lack of a cognizable property interest may be relevant to whether Plaintiff is entitled to any damages, other than nominal damages, on its free exercise claim.  Thus, while Plaintiff has provided evidence sufficient to establish a free exercise violation, its motion for summary judgment is granted as to liability only.  The measure of damages due to Plaintiff is a matter for the jury to determine.  Even if Plaintiff cannot prove it is entitled to any compensatory damages, nominal damages may be available for the constitutional violation.  *See Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 651 (2d Cir. 1998) ("[n]ominal damages are available in actions alleging a violation of constitutionally protected rights, even without proof of any actual injury").  Thus, Plaintiff's motion for summary judgment on its free exercise claim, Count Six, is GRANTED as to liability only.  Defendants' motion for summary judgment on Plaintiff's free exercise claim is DENIED.

### b.  Equal Protection

To state a claim for a violation of the Equal Protection Clause based on religion, Plaintiff must show "that a government actor intentionally discriminated against them on the basis of their religion." *Kiryas Joel All. v. Vill. of Kiryas Joel*, 495 F. App'x 183, 189 (2d Cir. 2012) (citing *Knight v. Connecticut Dep't of Pub. Health*, 275 F.3d 156, 166 (2d Cir. 2001).  The Second Circuit has recognized three ways a plaintiff can make this showing: "(1) a facially discriminatory law; (2) a facially neutral statute that was adopted with a discriminatory intent and applied with a discriminatory effect; and (3) a facially neutral law that is enforced in a discriminatory manner." *Congregation Rabbinical Coll. of Tartikov, Inc.*, 945 F.3d at 110–11. Here, because the Regulations are facially discriminatory, the Court need go no further in its analysis.

In examining whether the Regulations are facially discriminatory, the Court "must begin with [their] text, for the minimum requirement of neutrality is that a law not discriminate on its face.  A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 533.  Where a law or policy is discriminatory on its face, no further showing of discriminatory intent is required.  *See Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999); *Chestnut Ridge*, 2021 WL 3605041, at *2.

As explained above, the Regulations permitted by right in the M-4 district various uses, including offices, hotels, convention centers, shops and stores and service establishments (such as bakeries, barberies, restaurants, and theaters), and institutional, public, and municipal buildings, but, at the relevant time, prohibited places of worship in the district unless they received a special permit.   The Regulations were therefore discriminatory on their face.  As

explained above, it is clear that the Regulations treat comparable secular activities more favorably than religious exercise, by requiring a special permit for places of worship while allowing various secular uses as of right. Defendants have provided no secular meaning for the term "places of worship," nor can the Court conceive of one. *See Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 533. It is further undisputed that the Regulations were applied to Plaintiff and ultimately resulted in the denial of Plaintiff's land use application. Thus, Plaintiff has proven its claim for a violation of its right to equal protection under the law.

Defendants do not address the facially discriminatory nature of the regulations at all. Instead, they argue that Plaintiff has failed to point to any "similarly situated" nonreligious organization who was treated more favorably, such that Plaintiff could demonstrate a violation of its equal protection rights. This argument is relevant to a different method of proving an equal protection claim: whether a law is facially neutral, but enforced in a discriminatory manner. Given its holding that the Regulations are not facially neutral, the Court need not, and does not, reach the question of whether Plaintiff's proposed comparators were appropriate and given preferential treatment. *See Hayden*, 180 F.3d at 42; *Chestnut Ridge*, 2021 WL 3605041, at *2.

As discussed above, however, it is unclear what right, if any, Plaintiff had to use the property. As such, the measure of damages, if any, to which Plaintiff may be entitled, is a matter for the jury to determine. *See Irish Lesbian & Gay Org.*, 143 F.3d at 651. Thus, Plaintiff's motion for summary judgment on its equal protection claim, Count Seven, is GRANTED as to liability only. Defendants' motion for summary judgment on Plaintiff's equal protection claim is DENIED.

### c. Prior Restraint

Finally, while Plaintiff does not move for summary judgment on its prior restraint claim, Defendants do. In what has become a familiar refrain in this action, Defendants argue they are entitled to summary judgment on Plaintiff's prior restraint claim because Plaintiff did not have the necessary interest in the Property. However, Defendants once again provide no support, and the Court has been unable to locate any, for the proposition that a prior restraint claim requires Plaintiff to have a property interest of any kind. Thus, Defendants are not entitled to summary judgment on Plaintiff's § 1983 prior restraint claim, and their motion for summary judgment as it relates to the claim, Count Five, is DENIED.

### 3. Connecticut General Statutes § 8-8

Defendants also move for summary judgment on Plaintiff's claim under Connecticut General Statutes § 8-8. Connecticut General Statutes § 8-8 allows "any person aggrieved by any decision" of a municipal zoning or planning commission to seek review of the decision of that body. *See Firetree, Ltd. v. Norwalk*, No. 3:17CV1088 (MPS), 2018 WL 4398253, at *6 (D. Conn. Sept. 14, 2018) (considering § 8-8 appeal under supplemental jurisdiction).

An aggrieved person is defined as "any person owning land in this state that abuts or is within a radius of one hundred feet of any portion of the land involved in the decision of the board." Conn. Gen. Stat. § 8-8(a)(1). However, where a landowner and a non-landowner have an agreement for the non-landowner to use the land contingent on a decision by a zoning commission, the non-landowner can be an "aggrieved person" within the meaning of § 8-8. *Moutinho*, 899 A.2d at 33. Further, such an agreement need not be in writing as long as the parties intend "to abide by that agreement." *Id.* As discussed at length above, whether the parties had such an oral agreement is the subject of much disagreement, and a jury could

reasonably find that such an agreement either did or did not exist. Thus, Defendants' motion for summary judgment on Plaintiff's claim under Connecticut General Statutes § 8-8 must be DENIED.

### 4. *Connecticut Religious Freedom Act*

Finally, both Plaintiff and Defendants move for summary judgment on Plaintiff's claim under the CRFA. The CRFA provides that "the state or any political subdivision of the state shall not burden a person's exercise of religion . . . even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section." Conn. Gen. Stat. § 52-571b(a). Subsection (b) in turn provides that a political subdivision of the state "may burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 52-571b(b). Essentially, the CRFA requires the Court to apply strict scrutiny to a government action or law that burdens a plaintiff's exercise of religion.

Both parties agree that Plaintiff's CRFA claim is governed by the Connecticut Supreme Court's holding in *Cambodian Buddhist Society of Connecticut, Inc. v. Planning & Zoning Commission of Town of Newtown*, 941 A.2d 868, 894 (Conn. 2008). In *Cambodian Buddhist*, the Connecticut Supreme Court held that a town commission's denial of a Buddhist society's application to construct a meditation temple on its property did not unlawfully burden the society's exercise of religion under the CRFA. *Id.* at 894–96. In so holding, the court interpreted the meaning of the term "exercise of religion" in the CRFA, and concluded that the Connecticut legislature did not intend that "erecting a place of worship on a particular property constitutes the exercise of religion for purposes of the first amendment." *Id.* at 895. Thus, the

Buddhist society's activity was not protected by the CRFA. *Id.* The court based this finding in part on the fact that the CRFA does not contain a definition of "religious exercise" like that in RLUIPA, which defines "religious exercise" to include "[t]he use, building, or conversion of real property for the purpose of religious exercise." *See Cambodian Buddhist*, 941 A.2d at 896; 42 U.S.C. § 2000cc-5(7)(B). This Court is bound by the Connecticut Supreme Court's interpretation of Connecticut law, and must therefore hold that, just as the Buddhist society's request to build a temple on its land was not an "exercise of religion" under the CRFA, Plaintiff's request to build a mosque on the Property is likewise not protected under the CRFA.

Plaintiff's argument that *Cambodian Buddhist* leaves open the possibility the CRFA would apply strict scrutiny to certain land use regulations in certain instances does not change this outcome. To understand why, a more in-depth analysis of the holding of *Cambodian Buddhist* is required. The Connecticut Supreme Court stated:

> Accordingly, although we agree with the conclusion of the District Court in *Murphy v. Zoning Commission*, supra, 289 F. Supp. 2d at 114, that § 52–571b applies to some forms of government conduct to which RLUIPA does not apply, we do not believe *either* that the legislature intended that the construction of a place of worship would constitute religious exercise *or* that, in the absence of evidence of discrimination against a particular religious use or religious uses in general, the application of land use regulations that are intended to protect the public health and safety to such a use generally would be subject to strict scrutiny under the statute.[7]

941 A.2d at 896 (emphasis added). Based on the disjunctive syntax of this sentence, the Court believes that it contains two different holdings. First, the court held that "the legislature [did not] intend[] that the construction of a place of worship would constitute religious exercise." *Id.* As the CRFA applies only to cases where the Plaintiff's exercise of religion has been

---

[7] In the interest of completeness the Court has included this sentence in its entirety. The Connecticut Supreme Court's comments concerning the holding in Murphy v. Zoning Comm'n of Town of New Milford, 289 F. Supp. 2d 87, 114 (D. Conn. 2003), are not relevant to the present dispute.

burdened, this holding removes from the CRFA's purview all cases involving construction of a place of worship. Second, the sentence appears to suggest that, unless there is evidence of discrimination against a particular religious use or religious uses in general, the application of land use regulations that are intended to protect the public health and safety to such a use— which the Court takes to mean religious use—would not be subject to strict scrutiny under the CRFA. *Id.* Plaintiff parses the second sentence to argue that, in this case, there *is* evidence of discrimination against its particular religious use and religious uses in general, so the Regulations should be examined under strict scrutiny. Even crediting this argument, though, Plaintiff cannot surmount the Connecticut Supreme Court's initial holding that construction of a place of worship is not religious exercise.

This is because the instant case is one that is fundamentally about building a place of worship on a piece of property. Plaintiff has alleged "that the Meriden zoning regulations' effective requirement that any religious institution or assembly that wishes to *construct a place of worship* within Meriden must first undergo a highly discretionary special permit review process" violates the constitution and the CRFA. Compl. ¶ 5. Further, Plaintiff complains that the Defendants' refusal to issue their special permit "prevent[ed] the Center from *building* a mosque to accommodate its religious needs." Compl. ¶ 84. Thus, as in *Cambodian Buddhist*, the Court is constrained to find that Defendants' denial of Plaintiff's permit application to construct a mosque on the Property did not unlawfully burden Plaintiff's exercise of religion under the CRFA.

Finally, Plaintiff's argument in its supplemental briefing that a myriad of other states have interpreted their own religious freedom acts to apply to cases such as this one is unconvincing. *See* ECF No. 158 at 6–7. The issue in the present case is whether Plaintiff has

shown a violation of the CRFA.  This Court is bound by the Connecticut Supreme Court's interpretation of this statute, and that interpretation excludes the instant action.  What other state statutes allow or disallow is simply not relevant.

As Plaintiff has not demonstrated that its exercise of religion, as contemplated by the CRFA, was burdened, its motion for summary judgment on its CRFA claim must be DENIED, and Defendants' motion for summary judgment on the CRFA claim must be GRANTED.

## IV.    CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part.  Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

Specifically, Defendants' motion to dismiss is GRANTED insofar as Plaintiff's claims request injunctive and declaratory relief, but DENIED as to all other claims.

Plaintiff's motion for summary judgment is GRANTED as to liability for its equal protection and free exercise claims under 42 U.S.C. § 1983 (Counts Six and Seven).  The question of what damages Plaintiff is owed with respect to each of those claims is a question for the jury.  Plaintiff's motion for summary judgment is DENIED on all remaining claims.

Defendants' motion for summary judgment is GRANTED as to Plaintiff's CRFA claim (Count Nine).  Defendants' motion for summary judgment is DENIED as to all other claims.

The Court will schedule a telephonic status conference with the parties to discuss the scheduling of pretrial submissions and jury selection.

**SO ORDERED** at Hartford, Connecticut, this 30th day of September, 2022.

 /s/ Sarala V. Nagala
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE